IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **D.D.B.,** : | | |
| : | | |
| **Plaintiff,** : | | |
| : | | |
| v. : | No. 5:22-cv-137 (CHW) | |
| : | | |
| **KILOLO KIJAKAZI,** : | Social Security Appeal | |
| **Acting Commissioner of Social Security,** : | | |
| : | | |
| **Defendant.** : | | |
| : | | |

## ORDER

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff D.D.B.'s application for disability benefits. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. The Commissioner's decision is based on the application of proper legal standards and is supported by substantial evidence. Accordingly, the Commissioner's decision is **AFFIRMED**.

## BACKGROUND

Plaintiff filed an application for supplemental security income under Title XVI of the Social Security act on March 25, 2020, alleging that he had been disabled and unable to work since July 13, 2015. (R. 229-35). The Social Security Administration denied his application initially and on reconsideration. (R. 131-41). After his application was denied, Plaintiff had a hearing before an Administrative Law Judge ("ALJ"). (R. 47-89). Plaintiff was represented by counsel throughout these proceedings. The ALJ issued a decision finding that Plaintiff had not been

disabled since the date his application was filed, October 22, 2021. (R. 19-46). Plaintiff requested administrative review of the ALJ's decision, and the Appeals Council denied his request. (R. 227-28, 4-9). Plaintiff, proceeding *pro se*, timely filed this action for judicial review of the ALJ's decision.

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments

in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

This record focuses primarily on Plaintiff's treatment at Central Georgia Heart Center for his postural orthostatic tachycardia syndrome ("POTS"), as those records comprise the bulk of his relevant medical history.

On September 8, 2015, Plaintiff visited Dr. Carmine Oddis at Central Georgia Heart Center reporting dizziness, chest pain, headache, nausea, joint pain, muscle pain, back pain, neck pain, and shoulder pain. (R. 431). Plaintiff was not experiencing fatigue or palpitations, and he described his chest pain as a five out of ten. (*Id.*) Plaintiff was given an EKG exam, which measured his sinus rhythm at 69 BPM. (R. 433). Plaintiff visited Dr. Robert Pye at Central Georgia Heart Center on October 20, 2015, reporting dizziness. (R. 426). Plaintiff denied experiencing chest pain, palpitations, syncope, or edema at that time. (*Id.*) Plaintiff received an EKG exam, which found a normal sinus rhythm with a rate of 74 BPM. (R. 428). Plaintiff was prescribed fludrocortisone acetate to help with his reported dizziness. (R. 429). Plaintiff visited Dr. Oddis again on November 24, 2015. (R. 421). At the time, Plaintiff was prescribed fludrocortisone acetate and Cardizem CD. (*Id.*) Plaintiff had previously reported fatigue, chest pain, dizziness, shortness of breath, headache, and nausea, but he confirmed that most of his symptoms had improved since his last visit, with the exception of dizziness. (*Id.*) Plaintiff also reported experiencing head pain and stated that he "only feels better" when lying down. (R. 422).

Plaintiff received an EKG exam on November 24, 2014, which found a normal sinus rhythm of 83 BPM. (R. 423). Plaintiff's medications were adjusted such that his prescription for Florinef was stopped and a prescription for Ritalin was added. (R. 424).

Plaintiff visited Dr. Oddis on February 2, 2016. (R. 416). Plaintiff was then prescribed Ritalin and Cardizem CD. (*Id.*) This visit concluded his Cardizem prescription, as he had completed the course of treatment. (*Id.*) Plaintiff reported dizziness and syncope and denied having chest pain, palpitations, low blood sugar symptoms, or edema. (*Id.*) Plaintiff noted that he was having problems with his medications but confirmed that he had been taking them as prescribed and did not report any significant side effects. (*Id.*) Plaintiff received an EKG on February 2, 2016, which found normal sinus rhythm with a rate of 82 BPM. (R. 418). Plaintiff was prescribed Mestinon to help with his continued dizziness during that same visit. (R. 419). Plaintiff went to Dr. Oddis on March 8, 2016, reporting fatigue, chest pain, dizziness, cough, shortness of breath, headaches, nausea, diarrhea, bright blood in his stool, depression, and difficulties sleeping. (R. 411). Plaintiff was prescribed Nexium, Mestinon, and Ritalin. (*Id.*) Plaintiff returned to Dr. Oddis on August 23, 2016, regarding his POTS. (R. 406). Plaintiff was prescribed Mestinon, Nexium, and Ritalin at that time; however, he reported that he had not been taking the Mestinon because the pharmacy was out of stock. (*Id.*, R. 407). Plaintiff also reported experiencing fever, fatigue, dizziness, tachycardia, cough, shortness of breath, headaches, sweating, nausea, diarrhea, rash, anxiety, and depression. (*Id.*) Plaintiff visited Dr. Oddis again on February 28, 2017. (R. 401). At the time, Plaintiff was still taking Mestinon, Nexium, and Ritalin. (*Id.*) Plaintiff complained of fatigue, dizziness, shortness of breath, headaches, sweating, nausea, diarrhea, joint pain, muscle pain, pain while walking, and blurry vision. (*Id.*)

Plaintiff returned to Dr. Oddis on January 30, 2018, for a follow up appointment related to his POTS. (R. 391). Plaintiff received an MRI, which showed mild broad-based disc bulges without canal stenosis and mild bilateral foraminal narrowing on his L3-L4 vertebrae; mild-broad based disc bulge, bilateral facet arthropathy, mild canal stenosis, and mild bilateral foraminal narrowing on his L3-L4 vertebrae; broad-based disc bulge and bilateral facet arthropathy with ligamentum flavum hypertrophy, mild canal stenosis, and mild bilateral foraminal narrowing on his L4-L5 vertebrae; and broad-based disc bulge, bilateral facet arthropathy, no significant canal stenosis, and mild bilateral foraminal narrowing on his L5-S1 vertebrae. (R. 1029). The impression recorded in the MRI report was mild spondylosis of the lumbar spine without evidence of acute bony abnormality. (*Id.*) On July 24, 2018, Plaintiff visited Dr. Oddis for a follow-up visit regarding his POTS. (R. 385). At that time, Plaintiff had stopped taking all of his medications, reportedly because he could no longer afford them. (*Id.*) Plaintiff reported fever, fatigue, chest pain, dizziness, irregular heartbeat, cough, shortness of breath, headaches, sweating, nausea, diarrhea, joint pain, muscle pain, pain when walking, blurry vision, rash, itching, anxiety, and depression. (*Id.*) Plaintiff reported that his fatigue, dizziness, heart palpitations, and shortness of breath, all symptoms related to his POTS, had gotten worse since he stopped taking his medication. (*Id.*)

On March 12, 2019, Plaintiff presented at Central Georgia Heart Center for atypical chest pain. (R. 375). Dr. Oddis noted that Plaintiff's chest x-ray showed no acute process, that his CT scan showed degenerative changes in his spine, and that Plaintiff was not on medication management at that time. (*Id.*) Dr. Oddis further noted that Plaintiff complained of fatigue, weight loss, dizziness, chest pain, palpitations, shortness of breath, cough, headaches, sweating, nausea, diarrhea, joint pain, muscle pain, pain in his muscles when walking, blurry vision, itching, anxiety,

depression, and a rash. (*Id.*) On June 25, 2019, Plaintiff returned to Dr. Oddis and reported substantially similar symptoms as those described during his March 12, 2019, visit. (R. 370). On February 13, 2020, Plaintiff had a follow-up appointment for his POTS with Dr. Oddis. (R. 364). Dr. Oddis reported that Plaintiff was not on medication management at that time, that he had been referred to OrthoGeorgia on his last visit for further evaluation of his back pain, and that he had not yet reported to OrthoGeorgia. (*Id.*) Dr. Oddis further noted that Plaintiff had "failed" taking Midodrine, Mestinon, Ritalin, and Cardizem previously and that he had started on Florinef on his last visit but reported that Florinef did not work for him either. (*Id.*, R. 368). Plaintiff returned to Dr. Oddis on October 20, 2020, when he reported severe head plain that radiated from the left side of his head to the front. (R. 908). Plaintiff denied experiencing chest pain, shortness of breath, dizziness, pedal edema, palpitations, or syncope. (*Id.*) Plaintiff was prescribed Cymbalta in addition to his ongoing prescription for Guanfacine. (*Id.*) An EKG exam was administered to Plaintiff, which found a normal sinus rhythm with a rate of 86 BPM. (R. 909).

Plaintiff visited Dr. Oddis on January 26, 2021, at which time he was taking Cymbalta and Guanfacine. (R. 900). Plaintiff reported that the Guanfacine was causing dry mouth, and this medication was discontinued. (*Id.*) Plaintiff also reported symptoms of chest pain and fatigue, but denied experiencing shortness of breath, dizziness, pedal edema, palpitations, or syncope. (*Id.*, R. 901). During this visit, Plaintiff was prescribed Wellbutrin, Prazosin, Vistaril, and Midodrine. (R. 900, 904). Plaintiff returned to Dr. Oddis on May 11, 2021, and reported that his symptoms had remained the same, as he was still experiencing atypical chest pain, dizziness, fatigue, shortness of breath, palpitations, nausea, diarrhea, and headaches. (R. 893). At the time, Plaintiff was prescribed Midodrine, Vistaril, Prazosin, and Wellbutrin. (*Id.*) During this visit, Dr. Oddis added prescriptions for Singulair and Cymbalta to Plaintiff's regimen. (*Id.*)

Plaintiff's medical records also include reports from years of mental health treatment at River Edge Behavioral Health. These records focus primarily on summaries of the staff's interactions with Plaintiff during counseling sessions, adjustments in medication, and other mental health management related to Plaintiff's anxiety and major depressive disorder. (*See* R. 554-892). Plaintiff's mental health records show that he has dealt with depressive pain for years; he has a family history of similar mental health issues by way of his father; and that he faced additional emotional difficulties as his physical illnesses developed and he lost his job and experienced financial difficulties that affected his ability to get medications. (*See* R. 845-46).

*Hearing Testimony*

At his hearing before the ALJ, Plaintiff described his educational background as having completed high school and an associate degree in criminal justice. (R. 56-57). Plaintiff explained that he had previously worked for the Department of Corrections for six years, until he stopped working in 2015. (R. 57). At the Department of Corrections, Plaintiff began working as a "CO1," a role that required him to supervise inmates, occasionally lift and carry things, and to be able to physically restrain an inmate if necessary. (R. 58). Plaintiff was promoted to a "CO2" after two years. (*Id.*) Plaintiff described prior work repairing coils used in heating and air conditioning units. (R. 63). Plaintiff explained that he was let go from his job at the Department of Corrections after his health issues began and he was denied worker's compensation for an injury. (R. 61).

When the ALJ asked Plaintiff to describe his POTS symptoms, Plaintiff explained that standing was difficult, he had to walk with a cane, he felt like he was off-balance, he experienced significant chest pain that felt like a heart attack and numbness and pain in his hands, legs, and feet. (R. 64). Plaintiff also described feeling significant dizziness that had caused him to fall onto the concrete while he was working at the Department of Corrections. (R. 66). Plaintiff stated that

he stayed in bed sometimes and that his family no longer provided him with the help that they used to. (R. 64-65). Plaintiff explained that sometimes he was unable to leave bed to the extent that he failed to take his medications or bathe regularly. (*Id.*) As to physical limitations, Plaintiff stated that he was unable to stand or walk for very long and unable to help with chores, that he had to use a cane to walk, that he sometimes had headaches to the extent that he could not function, and that he experienced blurry vision. (R. 67-72). Plaintiff also suffered from symptoms of depression, such as crying spells and sudden anger, as well as "symptoms of [post-traumatic stress disorder]" like nightmares, flashbacks, and panic attacks. (R. 71-72). However, Plaintiff acknowledged that he was never diagnosed with PTSD. (*Id.*)

Plaintiff testified that he experienced more symptoms when he was more active and that he continued to experience these symptoms despite his medications. (R. 73-74). Plaintiff described problems with concentration, explaining that he had trouble focusing on things because his attention kept being drawn back to his ongoing health concerns. (R. 74). Plaintiff found it difficult to reach over his head because of a torn rotator cuff in his left shoulder, but he testified that he could still lift five or ten pounds. (R. 75-76). Plaintiff explained that he could not kneel or bend over because he would "get stuck" when his back tightened up in that position. (R. 76). Plaintiff testified that he could not work even a simple full-time job because of his conditions. (R. 77).

## DISABILITY DETERMINATION

Following the five-step evaluation process, the reviewing ALJ made the following findings. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 25, 2020. (R. 25). At step two, the ALJ found that Plaintiff has the following severe impairments: cardiogenic syncope/postural orthostatic tachycardia syndrome ("POTS");

osteoarthritis; degenerative disc disease; impingement syndrome of left shoulder; cervico-occipital neuralgia; sciatica; obesity; depression; and anxiety. (*Id.*) At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 25-26). Before evaluating Plaintiff at step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found that Plaintiff had the RFC to perform light work as defined in 20 CFR § 404.1567(b) with the following exceptions: he can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop kneel, crouch, and crawl; he can frequently reach with the left non-dominant arm; he can have frequent exposure to extreme heat and extreme cold and can never have exposure to wetness or humidity; he can never operate a motor vehicle as part of work duties; he can perform simple, routine tasks with simple instructions; he can apply common sense understanding to carry out written, oral, or diagrammed instructions; he can deal with problems involving several concrete variables in or from standardized situations; he can work in environments with occasional changes in workplace settings and routines; and he can occasionally interact with the general public. (R. 26-39). At step four, with the benefit of a Vocational Expert, the ALJ found that Plaintiff could not perform any of his relevant past work. (R. 39). At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff is able to perform. (R. 40). Accordingly, the ALJ found that Plaintiff was not disabled. (R. 41).

## ANALYSIS

Plaintiff, who is proceeding *pro se*, submitted a two-page brief that raises several issues in a cursory manner but does not specifically allege that the ALJ made a reversible error or that her findings were not supported by substantial evidence. Because Plaintiff has failed to raise any

arguments with merit and because the ALJ's decision is supported by substantial evidence, the Court must affirm the ALJ's decision.

*Plaintiff's arguments are without merit*

Plaintiff's brief primarily lists his current conditions and describes various symptoms and difficulties related to his conditions. (Doc. 10). In addition, Plaintiff states in a conclusory manner that "many" of his medical records were left out of his case, that the ALJ improperly considered his age and education when making her decision, and that unnamed doctors and counselors have said he cannot work. (*Id.* at 1-2). Plaintiff provides no substantial support or detailed explanation for any of these claims. These unsupported contentions are insufficient to challenge the ALJ's findings. Although *pro se* plaintiffs are entitled to a lenient interpretation of their pleadings, the Court may not rewrite their arguments or otherwise advocate on their behalf. *See GJR Invs., Inc., v. Cnty. Of Escambia Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) ("even in the case of *pro se* litigants[,] this leniency does not give a court license to serve as *de facto* counsel for a party" or "rewrite an otherwise deficient pleading in order to sustain an action") *overruled on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). Nevertheless, the Court has considered Plaintiff's arguments and found no basis for remand.

First, Plaintiff contends that some of his medical records were left out of his case.[1] (Doc. 10 at 1). Plaintiff does not identify which medical records are missing, however, and the record shows that in prior proceedings, when Plaintiff was represented by counsel, the period for adding to the record was extended and additional records were added after the ALJ hearing. (R. 53-54,

---

[1] Notably, Plaintiff refers to the "ALJs" and "hearings" in his brief, indicating that he is also referencing his prior Social Security proceeding in addition to the present case. Plaintiff previously appealed a rejection of his application for disability insurance benefits under Title II of the Social Security Act in a separate case, but Plaintiff filed a stipulation of dismissal of that action while represented by counsel. *See Battle v. Saul*, No. 5:20-cv-72 (MTT) (CHW), Doc. 12. Accordingly, Plaintiff's references to the prior case have been disregarded.

87, 23, 1354-58). The Court could not identify any obvious missing records in its review of the case. Second, Plaintiff argues that the ALJ at his hearing was "mostly concerned" with his age, education, and legal cases. (Doc. 10 at 1). The Court has also failed to find any inappropriate consideration of Plaintiff's age in the record. Indeed, it would be difficult to find that consideration of Plaintiff's age could be inappropriate, as age is one of the factors that ALJs are required to consider according to the Social Security guidelines. *See* 20 C.F.R. §§ 416.963, 416.964. Similarly, ALJs are required to consider an applicant's educational background when making their findings. (*Id.*) As to Plaintiff's contention that the ALJ was overly concerned with his "legal cases," the Court did not find any inappropriate emphasis on other legal cases in the record. Third, Plaintiff claims that "doctors and counselors" have said that he was unable to work. (Doc. 10 at 1). Plaintiff does not name these doctors or counselors, but the ALJ addressed such statements from Dr. Craig Colby and Dr. Carmine Oddis in making her decision. (*See* R. 35-36). As the ALJ explained, these statements from doctors are not medical opinions, but rather statements that speak to an issue reserved for the Commissioner's decision. *See* 20 C.F.R. §§ 416.920(b)(c), (c)(3)(i) (stating that mere statements that a claimant cannot work are "inherently neither valuable nor persuasive to the issue of whether [a claimant] is disabled or blind" in a Social Security determination). A doctor's statement that a patient cannot work is not adequate on its own to support a finding of disability. Rather, that conclusion must be supported by substantial evidence that shows a claimant is disabled.

Plaintiff's list of conditions and symptoms is likewise insufficient to warrant remand. The mere existence of medical maladies does not mandate a finding of disability. *See McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) ("the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality"); *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6

(11th Cir. 2005) (holding that the existence of a "severe" impairment identified at step two of the disability analysis does not reveal the extent to which the impairment inhibits a claimant's ability to work); *Wind v. Barnhart*, 113 F.App'x. 684, 690 (11th Cir. 2005) ("[A] diagnosis or a mere showing of a 'deviation from purely medical standards of bodily … normality' is insufficient; instead, the claimant must show the effect of the impairment on [his] ability to work").  The ALJ assessed Plaintiff's conditions when making her decision and found that Plaintiff's conditions resulted in significant limitations on his ability to work but were not severe enough to render him entirely unable to work.  Plaintiff's repetition of his conditions and symptoms does not overcome that finding.  Plaintiff also describes various personal problems, such as his difficult financial situation. (Doc. 10 at 1-2).  While Plaintiff's circumstances are unfortunate, they do not provide an appropriate basis for remand.

Accordingly, Plaintiff has provided no argument that the ALJ committed reversible error or that her decision is not supported by substantial evidence.

*The ALJ's decision is supported by substantial evidence*

The ALJ followed the sequential evaluation process thoroughly, explaining her decisions at each step of the process.  According to Plaintiff's age, education, and work experience, along with his RFC, the ALJ found that Plaintiff could perform work existing in significant numbers in the national economy, such as garment sorter, mail-sorter clerk, and coupon-redemption clerk. (R. 40-41).  In making these assessments, the ALJ properly considered the record, including objective medical findings, medical opinions, Plaintiff's medical history, his subjective complaints, and daily activities. (R. 25-39); *see also* 20 C.F.R. §§ 416.912, 416.920(c), 416.945(a)(3), 416.946(c). After considering these various forms of evidence, the ALJ reasonably concluded that Plaintiff's subjective statements regarding his conditions and abilities were "not wholly consistent because the medical evidence does not support [Plaintiff's] allegations of severe and chronic limitation and

12

chronic limitation of function to the degree that it would preclude the performance of all substantial gainful activity." (R. 30). The ALJ explained:

> The bulk of the medical records are related to the claimant's POTS. The record shows the claimant had reasonably good control of his POTS and associated symptoms when he was appropriately taking his medication, and that even when he was not taking medication, he did not report syncope or falls, and none are objectively documented. Furthermore, while the record supports the presence of other severe physical impairments described above, the objective evidence does not support a greater degree of limitation than that accounted for in the residual functional capacity. The claimant had "mild" findings in an MRI for the lumbar spine and, while the record suggested he ambulated with a cane, there is no prescription for a cane in the record and the evidence does not indicate that a cane is medically necessary for ambulation. His past medical history suggested a history of a rotator cuff tear in the left shoulder, but the record contains very limited objective findings related to the left shoulder and few subjective complaints of left shoulder pain.

(R. 33-34).

These statements are consistent with the medical record. Similarly, the ALJ found that Plaintiff's alleged degree of mental impairment was not consistent with the objective medical evidence in the record. (R. 36). In reaching this finding, the ALJ relied upon the relatively conservative treatment that Plaintiff had received for his mental conditions and his mental status examinations, which failed to show significant impairment. (R. 36-37).

Although the ALJ found discrepancies between the objective medical evidence and Plaintiff's subjective complaints, she still "accounted for some of [Plaintiff's] subjective complaints in light of the objective medical evidence" when determining his RFC. (R. 34). Additionally, the ALJ found that the evidence within the record credibly supported work-related limitations that were also accounted for in the RFC. (*Id.*) Therefore, the ALJ determined that Plaintiff could physically "perform work-related activities within a limited range of light exertion;" "occasionally climb ramps and stairs, but can never climb ladders ropes, or scaffolds;" "occasionally balance, stoop, kneel, crouch, and crawl;" "occasionally

reach with the left non-dominant arm;" "can have only frequent exposure to extreme heat and extreme cold and can never have exposure to wetness or humidity;" and "can never operate a motor vehicle as part of work duties." (*Id.*) As to Plaintiff's mental abilities, the ALJ found that his symptoms waxed and waned and accordingly determined his RFC in light of his symptomatic periods. The ALJ found that:

> [t]he record does not support a finding that during symptomatic periods, work within this residual functional capacity could not be performed. Multiple mental status exams indicate the claimant was able to maintain concentration, had awareness of current events, was fully oriented, cooperative, calm with grossly intact memory, albeit at times depressed mood, even during periods when he reported increased depression and other symptoms.

(R. 37).

The ALJ reasonably considered the prior administrative medical findings of state agency medical consultant Dr. S. Ehsan and Dr. R. Joontz in making her findings. (R. 34, 38). Dr. Ehsan determined that Plaintiff could perform a limited range of light work, while Dr. Joontz determined that Plaintiff was able to understand and complete simple tasks for two-hour periods, work under supervision with co-workers with limited contact with the general public, and successfully adapt to simple workplace changes. (*Id.*); *see also* 20 C.F.R. § 416.913(a)(b)(1) (describing state agency medical consultants as "highly qualified and experts in Social Security disability evaluation"). The ALJ summarized the basis of her RFC finding as follows: "the above residual functional capacity assessment is supported by careful consideration of the combination of impairments, which result in some limitation, but do not prevent the claimant from performing a limited range of light work as defined above." (R. 29).

The ALJ determined that Plaintiff could not perform any of his past relevant work at the fourth step of analysis, then found at the fifth step that there was other work existing in significant numbers in the national economy that Plaintiff could perform. (R. 40-41). The ALJ posed

hypothetical questions to the ALJ that included Plaintiff's relevant vocational information, including the limitations that the ALJ identified in her assessment of Plaintiff. (R. 29, 78-79). The vocational expert identified several jobs that a hypothetical individual with Plaintiff's limitations could perform, and Plaintiff has not contended that he is unable to perform the occupations identified by the vocational expert and the ALJ. (*Id.*)

As explained above, the ALJ's analysis complied with the requirements for disability evaluation and is supported by substantial evidence. Accordingly, the ALJ's findings must be affirmed.

## CONCLUSION

Plaintiff's arguments, which fail to show that the ALJ made a reversible error or that the ALJ's findings are not supported by substantial evidence, are meritless. Accordingly, the Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, this 22nd day of August, 2023.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge